**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MICHAEL A. LEONARD,

*Plaintiff*,

v.

TOWN OF WESTBOROUGH; TODD MINARDI; and BODHAN BUKHENIK,

*Defendants*.

Civ. No.: 4:25-cv-40053-MRG

**MEMORANDUM AND ORDER**

**GUZMAN, J.**

This case arises from an encounter between Plaintiff Michael Leonard ("Leonard") and Defendant Officer Bodhan Bukhenik ("Officer Bukhenik") outside the Westborough Public Library on August 8, 2024. That evening, Leonard was walking home from the library, carrying a bag of oranges, a pencil, and a stack of papers. Officer Bukhenik and another officer not party to the action approached Leonard on the sidewalk in response to a report that a male party matching his description had attempted to open the library's doors after closing. Leonard was loud and profane throughout the encounter, protesting both the stop itself and the accuracy of the report. At times, Leonard moved toward Officer Bukhenik and declined to back away when asked.

Minutes into the encounter, Officer Bukhenik pushed Leonard backward. Several minutes later, Leonard was brought to the ground and arrested. When Officer Bukhenik announced the arrest, Leonard was moving away from the officers. The entire encounter was captured on Officer

Bukhenik's body-worn camera. The video does not show Leonard touching either officer or attempting to strike, grab, or otherwise make physical contact with either officer before the arrest.

Leonard, proceeding *pro se*, brings constitutional claims under 42 U.S.C. § 1983 and several claims under Massachusetts law against the Town of Westborough, Chief Todd Minardi, and Officer Bukhenik. Each party has moved for summary judgment. [ECF Nos. 28, 51, 53, 55].

The Court **GRANTS** summary judgment for Chief Minardi and the Town of Westborough on all claims against them. The Court **GRANTS IN PART** Leonard's motion for summary judgment on his unlawful arrest claim and **DENIES** Officer Bukhenik's motion as to that claim. The Court **GRANTS** summary judgment for Officer Bukhenik on Leonard's claims for excessive force, malicious prosecution, defamation, harassment, negligence, and loss of consortium. Leonard's First Amendment retaliation claim survives and will proceed to trial, along with the question of damages for the unlawful arrest. Chief Minardi's and the Town's earlier motions for judgment on the pleadings are **DENIED AS MOOT**.

## I. FACTUAL BACKGROUND

The following account is drawn from Officer Bukhenik's body-worn camera footage,[1] which the Court has reviewed directly, together with the parties' Statements of Material Facts [ECF Nos. 57, 61, 67] and supporting exhibits.[2] Where the video itself resolves a factual question, the Court relies on the video. Scott v. Harris, 550 U.S. 372, 380–81 (2007).

[1] The body-camera footage was hand-delivered to the Clerk's Office on a CD. [ECF No. 57-3]. No party disputes the accuracy or completeness of the footage. The Court cites the 17-minute-and-51-second recording throughout by timestamp; *e.g.*, [4:18] for a specific point in the recording and [8:03–8:07] for a span of elapsed time.

[2] For ease of reference, the Court cites Defendants' consolidated statement of material facts, [ECF No. 57], as "SOF," using that submission's paragraph numbering. The Court has also considered Leonard's statement of material facts, [ECF No. 61], and his responses to Defendants' statement. The Court does not treat as undisputed any factual assertion that Leonard properly controverts pursuant to Local Rule 56.1 or that is not adequately supported by the record.

**A. The Call and the Approach**

On the evening of August 8, 2024, library employee Megan Donaty told a coworker, Caitlin Staples, by text message that a patron, later identified as Leonard, was "pacing around the building" and that "we need to report this guy or keep an eye on him." [ECF No. 57-1 at 2]. Donaty separately stated in a written incident report that she saw Leonard follow her departing coworker's car and then try to open a side door of the library. [ECF No. 57-5 at 2].

Based on this information, Staples called the Westborough Police Department's non-emergency line and reported a "creepy patron" who was "walking around the building like trying all the doors and stuff." [SOF ¶ 5]. Dispatch relayed this to Officers Bukhenik and Sweitzer as a report of a "male party who was walking around the building attempting to open all of the doors to see if they were unlocked." [SOF ¶ 6]. Nothing further was relayed by dispatch.

Officer Bukhenik drove to the area and, at approximately 8:10 p.m., exited his vehicle. [0:15]. At that moment, Leonard was walking away from the library on the public sidewalk at a normal pace, carrying papers and a bag of oranges. [0:25]. Officer Bukhenik approached him on foot. Within five seconds, Officer Bukhenik had closed the distance between them. [0:30].




*At 0:25, Leonard walking away from the library on Parkman Street, before Officer Bukhenik made contact.*




*At 0:30, five seconds later.*

### B. The Encounter

Officer Bukhenik asked Leonard, "What is going on?" Leonard offered a handshake and identified himself. Officer Bukhenik declined the handshake and asked Leonard to step back.

[0:25–0:40]. Leonard complied. [0:29–0:49]. Officer Bukhenik then asked Leonard why he had been touching the library doors and Leonard denied the accusation. [0:50–1:02].

At 1:02–1:03, talking in a conversational tone, Leonard took one step toward Officer Bukhenik, stating he was being "falsely accused." When Officer Bukhenik again asked him to step back, Leonard did not retreat and responded, "Don't talk to me like that." [1:06–1:20]. Leonard complained that "[he] did not do anything illegal." [1:19–1:23]. Officer Bukhenik responded, "No one is saying you did anything illegal." [Id.]

From this point forward, Leonard loudly and profanely expressed discontent with the encounter. Raising his voice, Leonard continued: "I did not touch any of the doors, do not talk to me like that, talk to me like a person." [1:25–1:32]. "I am being harassed by the police, and I will file a thing against you if you do not stop acting with this authoritarian nonsense," and demanded, "Do not question me like this, do you understand . . . son?" [1:58–2:17].

Officer Sweitzer arrived and, referring to the alleged door touching, told Leonard a complaint had been called in. [2:18–2:23]. Leonard asked who had made the complaint and threatened to sue the reporting witness for making a "false accusation." [2:23–2:36]. Leonard repeated, "I did not do anything illegal," and told the officers to "get the hell out of [his] face." [2:41–2:57].

At 3:06–3:20, Leonard rocked back and forth, pitched forward, and appeared to move a few inches toward Officer Bukhenik while raising his voice. The video nevertheless shows Leonard remaining generally in the same location rather than advancing toward either officer. [3:06–3:20]. At 3:21–3:28, Officer Bukhenik held up his hand and stated that he was demonstrating "personal space." Leonard responded that the space was his "personal space too"

and asked "on what legal basis" he lacked the right to stand where he stood "on public property." [3:21–3:34].

At 3:41–3:47, Officer Sweitzer asked Leonard where he was "headed" and told him he was "just trying to help [him] get a ride." Leonard declined the offer and stated he did not "appreciate being questioned." [3:47–3:51].

The video shows Leonard remaining generally in the same location for most of this period, with his hands visible, holding the papers, oranges, and pencil.[3] Although he made expressive hand and arm gestures at times while speaking, the video does not show Leonard reaching toward either officer, attempting to strike or grab either officer, or making physical contact with either officer. [0:30–4:15].




*At 3:06, Leonard's right arm and hands occupied with his papers and bag, during the exchange.*

[3] Officer Bukhenik does not allege, and the footage does not show, that Leonard used or attempted to use the pencil as a weapon.




*At 3:21, Officer Bukhenik's hand extended to demonstrate "personal space."*

**C. The Contact**

At 4:07–4:09, Officer Sweitzer asked Leonard, "why would somebody have called and said that you were trying the doors?" Leonard, raising his voice, replied, "Because they do not like me," adding, "you think you are some freaking hero" because "[the reporting caller] is a woman" [4:09–4:17]. At approximately 4:18, Officer Bukhenik extended his arm and his hand made contact with Leonard's upper torso, moving Leonard backward.

Following the contact, Leonard repeatedly yelled "assault," [4:18–4:38], and, for the first time, at 4:39–4:41, Officer Bukhenik told Leonard that he was "about to go for disorderly."




*At 4:17, immediately before contact.*




*At 4:18, Officer Bukhenik's hand reaches Leonard's upper body.*




*At 4:20, Officer Bukhenik's arm remains extended toward Leonard several frames after initial contact.*

Leonard continued arguing with the officers, threatening to sue Officer Bukhenik for assault and battery. [4:36-5:04]. He told Officer Bukhenik, "You're not going to fucking talk to me like that buddy, okay, I don't give a shit that you're a police officer." [5:24–5:28].

Leonard invoked the Fourth and Fifth Amendments in response to requests for identification, using profanity throughout. [6:03–6:45]. When asked to stop yelling, Leonard refused, telling the officers, "I don't give a fuck, I have freedom of speech," and told Officer Sweitzer, "You don't know what the fuck you're doing." [7:00–7:25]. At 7:50, Leonard placed the papers and bag of oranges on the ground. He then produced his license and only briefly flashed it in Officer Bukhenik's direction. [8:02].

At 8:03–8:07, while remaining in place and without advancing toward either officer, Leonard screamed, "fuck you, I am going after your job," while placing his license back in his wallet. Immediately thereafter, Officer Bukhenik stated, "you're going in cuffs,"[4] and reached for

[4] The audio is somewhat unclear as to the precise wording. The Court understands Officer Bukhenik to have said "you're going in cuffs," although he may have said "put him in cuffs."

Leonard. [8:07]. As Leonard reached down to gather his papers and oranges, Officer Sweitzer, looking toward Officer Bukhenik, asked, "Are we taking him?" Officer Bukhenik responded, "Yep." [8:10–8:11].




*At 8:09, Leonard, holding his license, standing in place with Officer Sweitzer present, moments before the arrest.*

After gathering his belongings from the ground, Leonard attempted to move past the officers, who were reaching toward him, and stated, "You cannot arbitrarily arrest somebody." [8:08–8:15]. Officer Bukhenik then grabbed Leonard's shirt, and a physical struggle followed, during which Leonard was taken to the ground. [8:16–8:38].

Continuing to yell, Leonard called the officers "cowards," and resisted being handcuffed while on the ground. [8:19–10:45]. He repeatedly yelled, "this is illegal . . . I didn't do anything." He was handcuffed at approximately 10:04–10:14.

**D. After the Arrest**

After the arrest, Officer Bukhenik described the encounter to a colleague: Leonard "kept on . . . screaming, gets in my face, gets in my face, I step back, push him . . . kept on yelling, we

asked for his ID, he failed to identify . . . and just went crazy . . . he started walking away from us, we grabbed him." [11:25–11:52]. Separately, Officer Bukhenik told Staples, "we literally were just going to ID him." [15:57–16:00].

Officer Bukhenik's police report states that Parkman Street was "a busy street with a lot of foot traffic" and that "[p]eople were walking their dogs and . . . were alerted and alarmed." [ECF No. 57-4 at 1–3]. The body-worn camera footage does not depict any pedestrians, dog-walkers, or other bystanders on Parkman Street during the encounter. The Google Maps and Street View imagery submitted by the parties provide additional context regarding the location: the library (circled in red) is directly across from the Forbes Municipal Building, with residential properties farther down the street. [ECF No. 77].



The imagery does not, however, establish how many pedestrians or other members of the public were present when Leonard was arrested. The parties dispute whether anyone other than the officers was present during the encounter. That dispute is addressed where relevant below.

Leonard was charged with disorderly conduct and resisting arrest. [ECF No. 57-6]. At arraignment, he was held in summary contempt for disruptive courtroom behavior, and the court ordered him evaluated for competency under Mass. Gen. Laws ch. 123, § 15. [ECF No. 57-7 at 3–4]. He was found incompetent to stand trial, and the Commonwealth entered a *nolle prosequi* on both charges on January 9, 2025. [Id.]

## II. PROCEDURAL HISTORY

Leonard first filed this action in Worcester Superior Court. [Leonard v. Town of Westborough, No. 2585CV00051-D (Worcester Superior Court, Jan. 10, 2025), ECF No. 1-1]. Defendants removed the case to this Court asserting federal question jurisdiction. [ECF No. 1]. Leonard brings claims for unlawful arrest, excessive force, and First Amendment retaliation under 42 U.S.C. § 1983 ("§ 1983" or "Section 1983"); malicious prosecution, defamation, negligence, and harassment under Massachusetts law; and loss of consortium. Leonard moved for summary judgment on January 20, 2026. [ECF No. 28]. Defendants opposed. [ECF No. 35]. Subsequently, each of the Defendants moved for summary judgment. [ECF Nos. 51, 53, 55]. Leonard opposed. [ECF Nos. 62–64]. The Defendants each filed replies. [ECF Nos. 65–67]. Leonard then responded to each reply. [ECF Nos. 72–74]. A motion hearing was held on May 22, 2026. [ECF No. 75]. The Court heard argument but took the matter under advisement. [Id.]

## III. LEGAL STANDARDS

### A. Summary Judgment

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).

Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant" but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" Dixon-Tribou v. McDonough, 86 F.4th 453, 458 (1st Cir. 2023) (quoting Lahens v. AT&T Mobility P.R., Inc., 28 F.4th 325, 333 (1st Cir. 2022)). The nonmoving party cannot "rest upon mere allegation or denials," but must instead "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–57 (1986).

Ultimately, the Court must distinguish which facts are truly material and consider whether—in the face of undisputed *material* facts—legal standards constrain Plaintiff's claims such that the Defendants are entitled to judgment as a matter of law. See Triumph Foods, LLC v. Campbell, 742 F. Supp. 3d 63, 69 (D. Mass. 2024) (citing Anderson, 477 U.S at 248).

### B. Constitutional Claims Under Section 1983

Leonard brings several claims under Section 1983. "Section 1983 is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights[.]"

Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). In order to succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law. Id. (citing Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997)). Vicarious liability is inapplicable to Section 1983 claims. See Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 75-76 (1st Cir. 2021) ("Officers are not liable under § 1983 for the actions of other officers"). As such, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

**C. Qualified Immunity**

Defendants maintain they are qualifiedly immune from liability. The qualified immunity doctrine protects public officials, in their individual capacity, "when a reasonable decision in the line of duty ends up being a bad guess—in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 22-24 (1st Cir. 2016) (quoting Taylor v. Barkes, 575 U.S. 822, 825 (2015)).

The Court is mindful that deciding qualified immunity at the summary judgment stage may present challenges. Indeed, because qualified immunity is an immunity from suit, it is "effectively lost" if permitted to proceed to trial. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). As such, the application of the doctrine should be resolved at the earliest stage of litigation, which typically occurs on a motion for summary judgment. See Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). The intersection of qualified immunity principles and summary judgment principles may present "thorny analytic[al] problems," including "a tug-of-war . . . between who gets the benefit of the doubt: summary judgment requires absolute deference to the nonmovant's factual assertions, while qualified

immunity demands deference to the reasonable, if mistaken, actions of the movant." Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (citation modified). Therefore, the Court must "identify the version of events that best comports with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Penate v. Sullivan, 73 F.4th 10, 17 (1st Cir. 2023) (quoting Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009)).

## IV. DISCUSSION

### A. Claims Against Chief Minardi

A supervisor is not liable under § 1983 on a theory of respondeat superior. See Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514–16 (1st Cir. 2016). Leonard does not allege, and the record does not show, that Chief Minardi was present, was consulted, or otherwise participated in or directed the events of August 8, 2024. [SOF ¶ 58]. Leonard's contention that Chief Minardi is liable because Officer Bukhenik violated his rights conflates supervisory liability with respondeat superior, which Guadalupe-Báez forecloses. Id. (determining that "a supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority" (citing Ramírez-Lluveras v. Rivera–Merced, 759 F.3d 10, 19 (1st Cir. 2014))). His remaining arguments—that Officer Bukhenik was later promoted, and that a prior incident involving Officer Bukhenik exists somewhere in the record—do not, even if credited, show that Chief Minardi personally participated in or was contemporaneously aware of this incident. Thus, Chief Minardi is also not liable under a "theory of deliberate indifference." Id. at 515. Accordingly, summary judgment is **GRANTED** for Chief Minardi on all claims.

### B. Claims Against the Town of Westborough

The Town is immune from Leonard's state-law negligence claim, both because he did not present it in writing as required by Mass. Gen. Laws ch. 258, § 4, and because Officer Bukhenik's investigative and arrest decisions fall within the discretionary-function exception of Mass. Gen. Laws ch. 258, § 10(b). See Sena v. Commonwealth, 629 N.E.2d 986, 990–91 (Mass. 1994). The Town is likewise immune from Leonard's intentional tort claims under Mass. Gen. Laws ch. 258, § 10(c).

Leonard's § 1983 claims against the Town fail because he has not shown a municipal policy or custom that caused his injury. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A single incident involving a single officer, together with an unspecified prior incident referenced but not developed in the record, falls well short of the pattern required to infer a custom of deliberate indifference. See Bordanaro v. McLeod, 871 F.2d 1151, 1156–58 (1st Cir. 1989). Accordingly, summary judgment is **GRANTED** for the Town on all claims.

### C. Claims Against Officer Bukhenik

The Court next turns to Leonard's claims against Officer Bukhenik.

#### *1. Unlawful Arrest*

Leonard alleges that his arrest was unlawful. The Fourth Amendment protects individuals from unreasonable seizures, including arrests made without probable cause. See U.S. Const. amend. IV; Karamanoglu v. Town of Yarmouth, 15 F.4th 82, 87 (1st Cir. 2021). The Fourth Amendment requires that a warrantless arrest, like this one, be supported by probable cause. See Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause exists where "the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information were

sufficient to warrant a prudent person in believing that" the arrestee had committed or was committing an offense. Deaton v. Town of Barrington, 100 F.4th 348, 356 (1st Cir. 2024) (quoting Beck, 379 U.S. at 91).

"The exact degree of certainty required to establish probable cause is difficult to quantify; it falls somewhere between 'bare suspicion' [and] what would be needed to 'justify . . . conviction.'" Burke v. Town of Walpole, 405 F.3d 66, 80 (1st Cir. 2005) (quoting Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003)). That inquiry is objective, focused on the facts and circumstances confronting the officer at the time, not his subjective state of mind. See Maryland v. Macon, 472 U.S. 463, 470–71 (1985).

Probable cause need only exist for any offense that *could be* charged on the facts known to the officer, regardless of the offense actually charged. See Devenpeck v. Alford, 543 U.S. 146, 153–55 (2004). Where the historical facts bearing on probable cause are undisputed, the question of whether they amount to probable cause is one of law. See Nuon v. City of Lowell, 768 F. Supp. 2d 323, 330 (D. Mass. 2011) (citing Maxwell v. City of Indianapolis, 998 F.2d 431, 434 (7th Cir. 1993)).

The Court considers each of Officer Bukhenik's asserted bases for probable cause in turn.

**a. Disorderly Conduct**

Officer Bukhenik contends he had probable cause to arrest Leonard for engaging in disorderly conduct under Mass. Gen. Laws ch. 272, § 53(b). The statute does not itself define "disorderly." See Waterman v. City of Taunton, 742 F. Supp. 3d 144, 157 (D. Mass. 2024). Since Commonwealth v. A Juvenile, Massachusetts courts have construed the term by reference to

subsections (a) and (c) of § 250.2(1) of the Model Penal Code.[5] See 334 N.E.2d 617 (Mass. 1975); Alegata v. Commonwealth, 231 N.E.2d 201, 210–11 (Mass. 1967).

Those subsections provide that:

> [a] person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or . . . (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

Model Penal Code § 250.2(1). To avoid First Amendment concerns, subsection (c) is "restricted to cases not involving protest or other expressive activities." Commonwealth v. Sholley, 739 N.E.2d 236, 242 (Mass. 2000) (citing Commonwealth v. Feigenbaum, 536 N.E.2d 325 (Mass. 1989)).

"Fighting" requires "the use of physical force or violence or any threat to use such force or violence." Nuon, 768 F. Supp. 2d at 331 (quoting Commonwealth v. Sinai, 714 N.E.2d 830, 834 (Mass. App. Ct. 1999)). "Tumultuous behavior" requires riotous commotion and excessively unreasonable noise sufficient to constitute a public nuisance and entails acts other than speech. Waterman, 742 F. Supp. 3d at 158 (citing A Juv., 334 N.E.2d at 628); Veiga v. McGee, 26 F.3d 1206, 1213–14 (1st Cir. 1994). Speech alone does not constitute disorderly conduct, even when loud, profane, or boisterous. Sinai, 714 N.E.2d at 834; A Juv., 334 N.E.2d at 628; Veiga, 26 F.3d at 1213–14. Nor does refusing an officer's order, standing alone, supply probable cause. See Sheehy v. Town of Plymouth, 191 F.3d 15, 22 (1st Cir. 1999).[6]

---

[5] The Supreme Judicial Court "limited the adopted portion of the Model Penal Code definition to § 250.2(1)(a) and (c), because § 250.2(1)(b), in the court's view, was unconstitutionally overbroad, reaching protected speech." Commonwealth v. Accime, 68 N.E.3d 1153, 1157 (Mass. 2017).

[6] See also Fla. v. Bostick, 501 U.S. 429, 437 (1991) (collecting cases) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

Applying the law to this case, neither subsection supplied probable cause on the facts shown in the record. As to subsection (a), Leonard did not touch, strike, grab, or lunge at either officer, and he made no threat of violence. At 1:02–1:03, Leonard took a step toward Officer Bukhenik while stating—in a conversational tone—that he was being "falsely accused." When Officer Bukhenik again asked him to step back, Leonard did not retreat. Later, at 3:06–3:20, Leonard pitched forward and appeared to move a few inches toward Officer Bukhenik while raising his voice. The Court does not discount that conduct. A reasonable officer could have perceived Leonard as confrontational, and his movement toward the officer and refusal to retreat are relevant to the totality of the circumstances.

But the conduct still did not amount to fighting or threatening behavior. Leonard never touched either officer, attempted to strike either officer, reached toward either officer, or threatened either officer with physical harm. Throughout this portion of the encounter, Leonard's hands remained visible and were occupied with his papers, bag of oranges, and pencil. Although he made expressive hand and arm gestures while speaking at times, the footage does not show him reaching toward either officer or attempting to touch either officer. The first physical contact in the encounter came from Officer Bukhenik, who, at approximately 4:18, extended his arm and moved Leonard backward. [4:18–4:20].

Leonard's movements toward Officer Bukhenik therefore did not amount to fighting or threatening behavior. Nor did they transform his otherwise expressive conduct into the type of riotous or tumultuous activity contemplated by the statute. See Nuon, 768 F. Supp. 2d at 331 (citing Sinai, 714 N.E.2d at 834) (defining fighting to require physical force, violence, or a threat to use such force).

Nor does the encounter constitute "tumultuous behavior." The footage depicts a sustained and at times heated confrontation between Leonard and two officers. At times, Leonard was loud and profane, took steps toward Officer Bukhenik, and declined to move farther away when instructed to do so. But "tumultuous behavior" requires more than an agitated confrontation or noncompliance with an officer's instructions. It requires riotous commotion and excessively unreasonable noise sufficient to constitute a public nuisance, and it entails conduct other than speech and expressive conduct. Waterman, 742 F. Supp. 3d at 158 (citing, *inter alia*, A Juv., 334 N.E.2d at 628). Nothing in the footage shows a riotous disturbance, a gathering or reaction by bystanders, or conduct that disrupted public order beyond the immediate encounter between Leonard and the officers. Id. (citing Nuon, 768 F. Supp. 2d at 327–28) (observing that "yelling, screaming, and cursing at a police officer in a residential neighborhood late at night is not, without more, tumultuous behavior under the [disorderly conduct] statute").

Officer Bukhenik principally relies on Commonwealth v. Sholley, 739 N.E.2d 236 (Mass. 2000). That case bears little resemblance to this one. Sholley, a "fathers' rights" activist, was enraged after a prosecutor obtained a conviction and jail sentence against a man he supported in an unrelated restraining-order case. Id. at 238–40. He ran screaming through a courthouse corridor shouting, "This means war! There's going to be bloodshed all over the streets!" Id. at 239. On the stairway, he stopped inches from the prosecutor, pointed his finger in her face, and yelled, "Watch out, Counselor"—conduct that itself supported Sholley's separate conviction for threatening to commit a crime. Id. at 239–41. Outside the courthouse, he told another employee to "remember what happened in Oklahoma" and warned that he was "a bomb ready to explode." Id. at 239. In response, a court officer abandoned his post guarding a sitting judge, the supervising prosecutor

broke off a conversation to check on her staff's safety, three off-duty police officers intervened, and bystanders emerged from offices and courtrooms to see what was happening. Id. at 243–45.

The Supreme Judicial Court ("SJC") held this conduct satisfied subsection (a)'s "tumultuous" prong. Id. at 241–42. Sholley argued his outburst was protected political protest, but the Court explained that the protest-protection limitation recognized in Commonwealth v. Feigenbaum, 536 N.E.2d 325 (Mass. 1989), applies only to subsection (c); a prosecution under subsection (a), as Sholley's was, requires no such showing. Sholley, 739 N.E.2d at 243 n.8.

Those circumstances distinguish Sholley from this case. Leonard took steps toward Officer Bukhenik and declined to retreat when asked, but he never threatened violence, never made a gesture that was independently charged or found criminal, never invoked a mass-casualty event, and never made physical contact with either officer. Unlike in Sholley, no one is shown reacting to the encounter. No one emerged from a building, no one stopped to watch, and no one altered course in response to what was happening. Indeed, the footage does not show any bystanders. The record here shows an argument between Leonard and two officers on an otherwise quiet street, not the courthouse-wide response Sholley turned on.

As to subsection (c), the relevant inquiry is whether Leonard created a "hazardous or physically offensive condition" through non-expressive conduct, a limitation that applies only to subsection (c), not subsection (a). Feigenbaum, 536 N.E.2d at 328; Sholley, 739 N.E.2d at 243 n.8. Much of the conduct Officer Bukhenik identifies—Leonard's volume, profanity, assertions of his rights, and accusations against the reporting witness—was speech and therefore cannot supply the non-expressive conduct subsection (c) requires.

Setting speech aside, what remains is Leonard's movement toward Officer Bukhenik at points during the encounter, his refusal to back away when instructed, and his intermittent rocking,

shuffling, and pitching forward. None of Leonard's conduct created a hazardous or physically offensive condition. Massachusetts courts applying subsection (c) have required a showing of conduct that actually endangers persons or property or obstructs their movement, not mere agitation or proximity. See, e.g., Feigenbaum, 536 N.E.2d at 328 (blocking a tow truck); Commonwealth v. Zettel, 706 N.E.2d 1158, 1161 (Mass. App. Ct. 1999) (refusing to move an illegally parked vehicle that was a "safety hazard for [elementary school] children"); Commonwealth v. LePore, 666 N.E.2d 152, 156–57 (Mass. App. Ct. 1996) (voyeurism); Nuon, 768 F. Supp. 2d at 331 n.4 (citations omitted) (Massachusetts courts have found hazardous conduct to include "the throwing of stink bombs, the strewing of nails or other dangerous substances in public passageways, or urinating in public"). Leonard's conduct did none of these things.

The timing of the encounter also makes clear why the later physical struggle does not establish probable cause for the arrest. At approximately 4:18 of the footage, Officer Bukhenik was the first to initiate physical contact, and it was not until approximately 4:39 that he stated Leonard was "about to go for disorderly." [4:18–4:41]. Several minutes later, at approximately 8:07, Bukhenik stated, "you're going in cuffs," and reached for Leonard. [8:07]. Only then did Leonard attempt to move past the officers' reaching arms, after which Officer Bukhenik grabbed Leonard's shirt and the physical struggle began. [8:08–8:38]. Thus, the physical struggle occurred only after Officer Bukhenik had announced that Leonard was "going in cuffs" and had initiated the arrest. Conduct occurring after the arrest began cannot supply probable cause that was required to justify the arrest in the first place.

Because the conduct element fails independently under both subsections, the Court need not resolve the parties' dispute over whether Officer Bukhenik accurately described Parkman Street as "a busy street with a lot of foot traffic." [ECF No. 57-4 at 1–2]. Even crediting that

characterization, conduct that is neither fighting, threatening, tumultuous, nor hazardous does not become disorderly merely because it occurs in a place where members of the public could have been present. Accordingly, Officer Bukhenik lacked probable cause to arrest Leonard for disorderly conduct.

**b. Assault**

Officer Bukhenik also contends that Leonard's conduct supplied probable cause for assault under a threatened battery theory. The record does not support that conclusion. Under Massachusetts law, that theory requires objectively menacing conduct undertaken with the intent to put the victim in fear of immediate bodily harm. See Commonwealth v. Gorassi, 733 N.E.2d 106, 110 (Mass. 2000). Words alone do not constitute assault unless, together with other acts or circumstances, they place the victim in reasonable apprehension of imminent harmful or offensive contact. Commonwealth v. Delgado, 326 N.E.2d 716, 719 n.3 (Mass. 1975) (quoting Restatement (Second) of Torts § 31 (1965)).

As discussed, Leonard did move toward Officer Bukhenik at points during the encounter, including at approximately 1:02–1:03, and later rocked, pitched forward, and shuffled while raising his voice. The Court does not discount that conduct. But the footage does not show Leonard striking, reaching toward, or grabbing Officer Bukhenik, or threatening to strike him. His hands remained visible and were largely occupied with papers, oranges, and a pencil. Nor did Leonard make a threatening gesture or threaten physical harm. The first physical contact in the encounter came from Officer Bukhenik, who extended his arm and moved Leonard backward at approximately 4:18.

The circumstances here are materially different from those in Gorassi, on which Officer Bukhenik exclusively relies. There, the defendant stood only a few inches from the victim, who had her back to a wall, and reached toward her. See Gorassi, 733 N.E.2d at 111. The SJC held that

this conduct was objectively menacing. Id. At the same time, Gorassi found insufficient to constitute assault the defendant's earlier conduct involving persistent, unwanted proximity without a gesture toward contact. See id.

Leonard's conduct is closer to the latter. Although he moved toward Officer Bukhenik and at times declined to step back, the footage does not show him reaching toward Officer Bukhenik or otherwise engaging in conduct indicating an imminent battery. And unlike the victim in Gorassi, who was trapped between the defendant and a wall, Officer Bukhenik was not physically constrained or prevented from moving away. See id. The encounter began with Leonard walking away from the library, and the officers remained free to maintain whatever distance they deemed appropriate.

In assessing whether there existed probable cause for assault, the question is not whether Officer Bukhenik could reasonably have been concerned by the encounter. It is whether Leonard's conduct provided probable cause to believe that he intentionally engaged in objectively menacing conduct threatening an imminent battery. On this record, Leonard's movement toward Officer Bukhenik, considered together with his yelling and refusal to step back, did not rise to that level. Nor did Leonard's words, without a threatening act or other circumstance indicating imminent physical contact, supply the missing element. See Delgado, 326 N.E.2d at 719 n.3. Assault therefore did not provide probable cause for the arrest.

**c. Interference with a Police Officer**

Officer Bukhenik next contends that he had probable cause to arrest Leonard for interference with a police officer. The record does not support that contention. Common law interference with a police officer requires an act that obstructs or hinders an officer in the lawful performance of a discrete police function, such as an arrest or search already underway. Mere reluctance to cooperate with an investigatory conversation is insufficient. See Commonwealth v.

Adams, 125 N.E.3d 39, 53 (Mass. 2019) (identifying as an element that "the defendant physically performed an act that obstructed or hindered a police officer in the lawful performance of that duty"); Rizzuti v. Cappabianca, 791 F. Supp. 3d 270, 306–07 (D. Mass. 2025) (interference where plaintiff physically inserted himself into an arrest already underway).

That element is absent here. Before the arrest, the police function at issue was the officers' investigation of the report that Leonard had attempted to open doors at the library. Leonard did not physically obstruct that investigation. To the contrary, albeit crassly and in an agitated state, Leonard remained at the scene and spoke with the officers for more than six minutes while Officer Bukhenik continued to question him. Nothing in the record indicates that Leonard physically prevented the officers from asking questions, obtaining information, or otherwise carrying out that investigation. The relevant police function before the arrest was therefore the investigation of the report, not an arrest, search, or other discrete police function that Leonard physically obstructed.

Leonard's failure to comply with requests that he step back, his verbal objections to the officers' conduct, and his other nonphysical conduct did not constitute the physical obstruction required for interference. Accordingly, interference with a police officer could not supply probable cause for his arrest.

**d. Disturbing the Peace**

Officer Bukhenik also contends that he had probable cause to arrest Leonard for disturbing the peace. The record does not support that conclusion. The offense is included in Mass. Gen. Laws ch. 272, § 53 and is construed according to its common law definition. See Commonwealth v. Federico, 876 N.E.2d 479, 483 (Mass. App. Ct. 2007). Under that definition, the offense requires conduct that is both unreasonably disruptive and actually infringes another person's right to be undisturbed. See Commonwealth v. Orlando, 359 N.E.2d 310, 312 (Mass. 1977); Commonwealth

v. Hokanson, 907 N.E.2d 674, 677 (Mass. App. Ct. 2009). Time and place are relevant to whether conduct is unreasonably disruptive. See Federico, 876 N.E.2d at 483.

Leonard's conduct does not satisfy those requirements. The Court does not minimize that Leonard was loud, used profanity, and acted confrontationally toward both officers. Leonard stepped toward Officer Bukhenik at approximately 1:02, declined to step back when asked, and later rocked, pitched forward, and shuffled while continuing to raise his voice. But the video shows no gathering or reaction by members of the public, no disruption of pedestrian traffic, and no other evidence that Leonard's conduct disturbed anyone other than the officers with whom he was engaged.

That distinction is significant. In Hokanson, the defendant's flailing and shouting caused alarm among a group of bystanders who gathered to watch the confrontation. See 907 N.E.2d at 677–78. In Commonwealth v Mullins, the defendant blared music and screamed obscenities from a window, disturbing residents in the neighborhood. See 582 N.E.2d 562, 564 (Mass. App. Ct. 1991). And in Federico, the defendant repeatedly triggered motion sensors, awakened neighbors, and ignored the officers' predictable reaction. See 876 N.E.2d at 483. Here, by contrast, there is no comparable evidence that Leonard's conduct had a detrimental impact on any member of the public.

Officer Bukhenik's report states that Parkman Street was "a busy street with a lot of foot traffic" and that people were "alerted and alarmed." But the body-camera footage shows no bystanders at all, much less any evidence that a bystander was disturbed by Leonard's conduct. Even crediting the report's characterization of the street, the mere possibility that members of the public were nearby does not establish that Leonard's conduct actually disturbed or infringed the rights of any member of the public. See Brown v. Butler, No. 3:17-cv-30030-MAP, 2017 WL

9673712, at *8–9 (D. Mass. Dec. 22, 2017) (conduct must at least threaten to have "some disturbing effect on the public" (quoting Commonwealth v. Baez, 678 N.E.2d 1335, 1338 (Mass. App. Ct. 1997))). Nor does Leonard's verbal criticism of the officers itself establish the offense. His statements, including his profanity and objections to the officers' conduct, were directed at the officers during their encounter with him. The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. See City of Houston, Tex. v. Hill, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). And there is no evidence here that Leonard's words, apart from their effect on the officers themselves, actually disturbed members of the public.

Accordingly, the record does not establish probable cause to believe that Leonard was engaged in the unreasonably disruptive conduct that constitutes disturbing the peace, or that his conduct actually infringed the right of any member of the public to be undisturbed. Officer Bukhenik therefore lacked probable cause to arrest Leonard on that basis.

***2. Qualified Immunity***

The Court has concluded that Officer Bukhenik lacked actual probable cause to arrest Leonard for any of the four proffered offenses. But that finding does not end the Court's inquiry. Officer Bukhenik argues that he is shielded by the doctrine of qualified immunity.

An officer is entitled to qualified immunity in an unlawful arrest case if probable cause was at least "arguable" with respect to any of the offenses. Put differently, if a reasonable officer possessing the same information could have believed probable cause existed, even if that belief was mistaken, the officer is entitled to qualified immunity. See Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013). That standard gives "ample room for mistaken judgments," protecting "all but the

plainly incompetent and those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citation omitted).

Qualified immunity does not attach where the absence of probable cause is not "arguable or subject to legitimate question." Wilber v. Curtis, 872 F.3d 15, 21 (1st Cir. 2017). The reasonableness of an officer's perception is judged under the totality of the circumstances. Barnes v. Felix, 605 U.S. 73, 78 (2025). That inquiry "has no time limit." Id. Earlier facts may inform how a reasonable officer would understand and respond to later conduct. See id.

Here, the information available to Officer Bukhenik when he approached Leonard was limited. Dispatch conveyed that a male patron was "walking around the building attempting to open all of the doors to see if they were unlocked." [SOF ¶ 6]. The report did not indicate that Leonard was armed, had threatened anyone, had committed an act of violence, or was suspected of any offense involving violence. Nor did it identify any specific criminal conduct beyond the reported attempts to open the library doors. Those facts—what Officer Bukhenik did and did not know when he made contact with Leonard—provide important context for assessing how a reasonable officer would have understood Leonard's later conduct. Barnes, 605 U.S. at 80–81; Ptak v. Patten-Steiger, No. 4:23-CV-11423, 2026 WL 771972, at *8 (D. Mass. Mar. 19, 2026) (applying Barnes to hold that officer's prior knowledge of decedent's reported bat threat and earlier property destruction informed the reasonableness of her perception of a threat, entitling her to qualified immunity).

The subsequent encounter changed the factual picture somewhat, but not enough to make probable cause reasonably arguable. Leonard was carrying papers, a pencil, and a bag of oranges. He spoke loudly and profanely, moved toward Officer Bukhenik at points, and declined to retreat when asked. He also rocked, pitched forward, and shuffled while continuing to argue. Those

circumstances could reasonably have caused an officer concern. But nothing in the information available to Officer Bukhenik suggested that Leonard was armed or violent, and Leonard never reached toward, struck, grabbed, or threatened either officer. Indeed, the first physical contact came from Officer Bukhenik, before Officer Bukhenik first stated that he was "about to go for disorderly." Against that factual background, none of the four asserted offenses supplied arguable probable cause.

For disorderly conduct, the governing cases have long made clear that loud or profane speech, refusal to comply with an officer's request, and expressive conduct do not, without more, constitute disorderly conduct. See Sheehy, 191 F.3d at 22; Veiga, 26 F.3d at 1213–14. The additional conduct here—Leonard's movements toward Officer Bukhenik and refusal to retreat—did not involve physical force, a threat of violence, a public disturbance, or a hazardous condition. Sholley involved materially different circumstances, including repeated threats of widespread violence, a threatening gesture, and a substantial reaction from courthouse personnel. 739 N.E.2d at 241–42. Probable cause for disorderly conduct was therefore not reasonably arguable.

The same is true of assault. Under the threatened battery theory Officer Bukhenik invokes, probable cause requires facts suggesting that Leonard intentionally engaged in menacing conduct that would reasonably cause an officer to fear an imminent battery. See Gorassi, 733 N.E.2d at 110. Leonard's movement toward Officer Bukhenik and his refusal to retreat could reasonably have caused concern, but concern is not the standard. The undisputed footage shows no reach, strike, grab, raised fist, or other gesture toward contact, and nothing that cornered or restrained Officer Bukhenik. Officer Bukhenik's own report describes Leonard as "close enough to frighten [him] that he could cause [him] physical harm if he decided to strike." [SOF ¶ 31]. That description turns on proximity and a hypothetical future choice, not on any act signaling that a battery was

about to occur. As discussed above, Leonard's conduct falls materially closer to the persistent-but-non-menacing proximity that Gorassi found insufficient than to the conduct it found objectively menacing. See 733 N.E.2d at 111. Probable cause for assault was therefore not reasonably arguable.

Nor was probable cause for interference reasonably arguable. Massachusetts law requires an act that obstructs or hinders an officer in the performance of a lawful duty, though the act need not involve physical contact. See Adams, 125 N.E.3d at 53. The SJC's own illustration of that standard confirms this conclusion. In Adams, the Court cited with approval a case where officers were "engaged in the performance of the lawful duty of keeping citizens away from a dangerous work area," and the plaintiff "obstructed or hindered them by blocking the work crew." Id. (discussing Wilber v. Curtis, 872 F.3d 15, 21–22 (1st Cir. 2017)). The First Circuit concluded that this conduct was sufficient to supply probable cause for interference. Id.

That is the type of obstruction the offense requires: a defendant placing himself or an object between an officer and a specific, ongoing duty, even without physical contact. Leonard did neither. He did not block a work site, an arrest, a search, or any other discrete police function. Instead, he remained largely in place and spoke with the officers during their investigation. His proximity, movement toward the officers, agitated demeanor, and refusal to step back do not—without more—render cause for interference reasonably arguable.

Finally, probable cause for disturbing the peace was not reasonably arguable. That offense requires unreasonably disruptive conduct that actually infringes another person's right to be undisturbed. See Orlando, 359 N.E.2d at 312; Hokanson, 907 N.E.2d at 677. The footage shows no bystanders or other evidence that a member of the public was disturbed by Leonard's conduct.

Officer Bukhenik's description of Parkman Street as busy does not supply that missing public impact.

The Court recognizes that officers are often required to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. See Graham v. Connor, 490 U.S. 386, 397 (1989); see also Barnes, 605 U.S. at 89–90 (Kavanaugh, J., concurring) (noting the "extraordinary dangers and risks facing police officers and the community at large"). But the qualified immunity inquiry remains what a reasonable officer possessing the same information could have believed. Moses, 711 F.3d at 216. Here, the information conveyed to Officer Bukhenik before he approached Leonard described a person trying library doors. There was no suggestion of an armed, violent, or threatening person. The subsequent conduct, viewed in that context and under the totality of the circumstances, did not supply even arguable probable cause for any of the offenses asserted here. Qualified immunity therefore does not shield Officer Bukhenik from Leonard's unlawful arrest claim.

Finding that Officer Bukhenik lacked probable cause for the arrest and that qualified immunity does not apply, summary judgment is **GRANTED IN PART** for Leonard as to his unlawful arrest claim against Officer Bukhenik.

***3. First Amendment Retaliation***

Leonard next argues that he was arrested in retaliation for engaging in protected speech in violation of the First Amendment. Because the Court has concluded that the arrest was unsupported by probable cause, Leonard will not be required to make the additional showing that would apply where probable cause supported the arrest. See Nieves v. Bartlett, 587 U.S. 391, 402 (2019). The claim therefore proceeds under the ordinary First Amendment retaliation framework: whether Leonard engaged in protected speech, whether that speech was a substantial or motivating factor

in Officer Bukhenik's actions, and whether Officer Bukhenik would have taken the same action regardless. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

There is sufficient evidence for a reasonable jury to find retaliation. Most directly, immediately after Leonard yelled "fuck you" multiple times and stated that he was "going after [Officer Bukhenik's] job," Officer Bukhenik announced, "you're going in cuffs." [8:03–8:07]. A jury could reasonably infer from that temporal proximity that Leonard's criticism of Officer Bukhenik motivated the decision to arrest him. The earlier sequence provides additional evidence of the same inference: Officer Bukhenik initiated physical contact with Leonard shortly after Leonard accused him of favoritism toward the reporting witness and before Bukhenik identified disorderly conduct as a basis for arrest. [4:09–4:39]. The jury may also consider the discrepancy between Officer Bukhenik's report, which described a busy street and people being "alerted and alarmed," and the video and Street View evidence, which show no bystanders during the encounter. [ECF Nos. 57-4 at 1–2, 76, 77]. That evidence bears on whether the asserted non-retaliatory justification for the arrest was genuine.

Whether Leonard's speech was a substantial or motivating factor in Officer Bukhenik's actions, and whether Officer Bukhenik would have taken the same actions absent that speech, are therefore questions for the jury. Summary judgment is **DENIED** as to the First Amendment retaliation claim, which shall proceed to trial.

***4. Excessive Force***

Even assuming an officer lacked probable cause for an arrest, that lack of probable cause, standing alone, is insufficient to establish that the force used to effect the arrest was excessive. See, e.g., Levy v. Lique, No. 10-CV-374-PB, 2012 WL 1600174, at *4 (D.N.H. May 7, 2012) (noting when "an officer arrests a person without probable cause but 'use[s] no more force than

would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force'" (quoting Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007))).

An excessive force claim is therefore analyzed "without regard to whether the arrest itself was justified." Freeman v. Gore, 483 F.3d 404, 417 (5th Cir. 2007). Leonard's excessive force claim accordingly does not turn on the Court's finding that Officer Bukhenik lacked probable cause for the arrest. It turns instead on whether the force used was more than would have been justified had the arrest been lawful.

The video shows that Officer Bukhenik made physical contact with Leonard at 4:18–4:21. The contact did not involve a strike, a weapon, or sustained restraint. Even crediting Leonard's account that the contact was unprovoked, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)); Nuñez v. Luciw, No. 24-CV-10848-PBS, 2025 WL 3732016, at *4 (D. Mass. Nov. 6, 2025) (dismissing excessive force claim where body camera footage showed brief, reasonable force to overcome resistance and plaintiff did not allege physical injury). On this record, no reasonable jury could find that the limited, de minimis force used here was objectively unreasonable.

To the extent Leonard's claim is understood to also challenge the force used to bring him to the ground and handcuff him after he resisted arrest, the same result follows. The undisputed footage shows Leonard pulling away and resisting officers' attempts to restrain him before he was taken to the ground. [SOF ¶¶ 50–55]. Force reasonably necessary to overcome active resistance during an arrest does not become objectively unreasonable simply because the arrest itself is later

found unsupported by probable cause. See Graham, 490 U.S. at 396. No reasonable jury could find the force used to secure Leonard's compliance objectively unreasonable on this record.

### *5. Malicious Prosecution*

Leonard's federal malicious prosecution claim fails at the threshold. A § 1983 malicious prosecution claim requires a seizure "pursuant to legal process." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013). A warrantless arrest does not itself constitute legal process, and a malicious prosecution claim cannot be premised on it. See Harrington v. City of Nashua, 610 F.3d 24, 32 (1st Cir. 2010); Meehan v. Town of Plymouth, 167 F.3d 85, 90 (1st Cir. 1999). Leonard's arrest was warrantless. His federal malicious prosecution claim therefore fails as a matter of law.

Leonard's state-law malicious prosecution claim requires, among other elements, that the underlying proceeding terminated in his favor. See Britton v. Maloney, 196 F.3d 24, 30 (1st Cir. 1999). The record does not establish a favorable termination. A *nolle prosequi* was entered after Leonard was found incompetent to stand trial. [SOF ¶¶ 64–65; ECF No. 57-7 at 2–4]. A *nolle prosequi* may constitute a favorable termination under Massachusetts law when the circumstances of the abandonment are consistent with the accused's innocence and compel an inference that there were no reasonable grounds to pursue the prosecution. See Wynne v. Rosen, 464 N.E.2d 1348, 1351–52 (Mass. 1984).

Here, however, the *nolle prosequi* followed Leonard's finding of incompetency to stand trial. The record contains no indication that the Commonwealth abandoned the charges because they lacked reasonable grounds or because Leonard was innocent of the charged conduct. The circumstances therefore do not support the inference required under Wynne. See id.

Accordingly, summary judgment is **GRANTED** for Officer Bukhenik on the malicious prosecution claim, both federal and state.

***6. Defamation***

Leonard's defamation claim fails at the threshold. To state a defamation claim, a plaintiff must identify a specific statement and show that it is false and would tend to hold him up to "contempt, hatred, scorn, or ridicule" in the community. Yohe v. Nugent, 321 F.3d 35, 40 (1st Cir. 2003) (quoting Tartaglia v. Townsend, 477 N.E.2d 178, 180 (Mass. App. Ct. 1985)). Leonard's own motion never identifies which statement in Officer Bukhenik's report he contends is defamatory; he asserts only that his arrest was "unjustified" and "malicious," which are characterizations of the arrest itself, not a false statement of fact published about him. [ECF No. 28 at 17–18]. To the extent the claim is understood to target the report's account that Leonard had been seen touching the library doors, Officer Bukhenik attributes that account to information relayed by library staff rather than his own observation. [ECF No. 28-1 at 5–6 (Ex. D)]. A statement that discloses its own source in this way states non-actionable opinion, "no matter how unjustified or unreasonable . . . how derogatory it is." Yohe, 321 F.3d at 41–42 (quotation omitted). Summary judgment is **GRANTED** for Officer Bukhenik on the defamation claim.

***7. Harassment and Loss of Consortium***

Leonard's harassment claim fails too. "Harassment" is not an independent cause of action under Massachusetts law. Bogan v. City of Boston, 489 F.3d 417, 422 n.13 (1st Cir. 2007). Because no underlying tort survives against Officer Bukhenik on these two claims, Leonard's loss of consortium claim also fails as to them, and in any event cannot be premised on his own alleged injury or on a § 1983 violation. See Sena, 629 N.E.2d at 994; Stallworth v. City of Cleveland, 893 F.2d 830, 838 (6th Cir. 1990) ("42 U.S.C. § 1983 . . . does not reach [the] claim of loss of consortium"). Summary judgment is **GRANTED** for Officer Bukhenik on these claims.

### *8. Negligence*

Leonard's negligence claim against Officer Bukhenik is independently barred. The Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, governs tort claims against public employers and employees in Massachusetts. Under the MTCA, individual public employees are not personally liable for injury caused by negligent conduct within the scope of their employment. Id. §§ 1–2. The claimant's only remedy lies against the public employer. Id.; Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003). Nothing in the record suggests Officer Bukhenik was acting outside the scope of his employment when he investigated and arrested Leonard. His alleged negligence is therefore not actionable against him personally, and Leonard's only remedy, if any, would lie against the Town. Summary judgment is **GRANTED** for Officer Bukhenik on the negligence claim.

* * *

For the reasons above, Leonard's motion for summary judgment [ECF No. 28] is **GRANTED IN PART** as to liability on his unlawful-arrest claim against Officer Bukhenik, and **DENIED** in all other respects.

## V. CONCLUSION

For the reasons set forth above, summary judgment is **GRANTED** for Chief Minardi and the Town of Westborough on all claims. As to Officer Bukhenik, Leonard's motion for summary judgment [ECF No. 28] is **GRANTED IN PART** as to liability on the unlawful arrest claim. Officer Bukhenik's motion for summary judgment on that claim is **DENIED**. Summary judgment is **GRANTED** for Officer Bukhenik on Leonard's claims for excessive force, malicious prosecution, defamation, harassment, negligence, and loss of consortium. Leonard's First Amendment retaliation claim survives summary judgment. The First Amendment retaliation claim

and the issue of damages on the unlawful arrest claim shall proceed to trial. The motions for judgment on the pleadings [ECF Nos. 30, 32] are **DENIED** as moot. For ease of reference, the disposition is provided in the below table.

**TABLE OF RULINGS**

| **Claim** | **Disposition** |
|---|---|
| Unlawful Arrest (Officer Bukhenik) | **GRANTED** for Leonard; **DENIED** for Officer Bukhenik. Damages to be tried. |
| First Amendment Retaliation (Officer Bukhenik) | **DENIED** for both parties. Proceeds to trial. |
| Excessive Force (Officer Bukhenik) | **GRANTED** for Officer Bukhenik. |
| Malicious Prosecution (Officer Bukhenik) | **GRANTED** for Officer Bukhenik. |
| Defamation (Officer Bukhenik) | **GRANTED** for Officer Bukhenik. |
| Harassment / Loss of Consortium (Officer Bukhenik) | **GRANTED** for Officer Bukhenik. |
| Negligence (Officer Bukhenik) | **GRANTED** for Officer Bukhenik. |
| All Claims (Chief Minardi) | **GRANTED** for Chief Minardi. |
| All Claims (Town of Westborough) | **GRANTED** for the Town. |

**SO ORDERED.**

Dated: September 30, 2026

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge